780 So.2d 386 (2000)
Jason Wade ROGERS, Plaintiff-appellee,
v.
Sandy STOCKMON, Defendant-appellant.
No. 34,327-CA.
Court of Appeal of Louisiana, Second Circuit.
November 1, 2000.
William G. Nader and Brian C. McRae, Counsel for Appellant.
Susan D. Scott, Shreveport, Counsel for Appellee.
Before CARAWAY, PEATROSS and KOSTELKA, JJ.
CARAWAY, Judge.
In this child custody dispute, the trial court granted joint custody of the minor child to the parents, with the father being designated domiciliary custodian of the minor child. Liberal visitation was granted to the mother in accordance with a Joint Custody Implementation Plan. From these rulings, the mother appeals the trial court's award of domiciliary status to the *387 father. Finding no merit to the mother's assignment of error, we affirm.

Facts
The parents to this custody dispute are Jason Wade Rogers ("Jason") and Sandy Stockmon Crnkovic ("Sandy"). While Jason and Sandy were living together and unmarried in September 1991, their son, Chase Wade Rogers ("Chase"), was born. Jason and Sandy continued to live together for a few months after Chase's birth, but soon separated. After the time of the couple's separation, Chase lived primarily with his mother at the home of his maternal grandfather, Alex Stockmon ("Alex").
As Chase was growing up, Jason lived with his grandparents in Stonewall, and his contact with Chase consisted of two to four periods of custody per month. During that time, Chase also spent the night on various occasions with Jason's mother. Sandy characterizes her relationship with Jason during that period as amicable. As Sandy described the parties' informal custody arrangement, Chase would be allowed to go with Jason and "when Chase is ready to come home he calls me and I get him." Concerning the child's support, Jason testified that he would provide financial assistance to Sandy when she requested it. However, Sandy testified that prior to 1998, the amount of support that Jason provided to her through the years totaled only $1,500.
In May of 1998, Sandy was living in an apartment in Shreveport with Chase and working. Because of the need for Chase's day care during the summer, Sandy agreed to allow Chase to live with Jason. Jason was unemployed at the time. Chase remained with Jason under this arrangement until around the July 4th weekend when Sandy obtained Chase through her mother, Vicky Wallace ("Vicky"). At that time, Sandy began living with Brian Crnkovic ("Brian"), to whom she was later married in October 1998.
On August 27, 1998, Jason instituted these proceedings requesting provisional custody, claiming that Chase had been removed from him in July against his will and that he had not been allowed to visit with Chase since that time. He claimed in his petition that he had fears for Chase's safety, citing the attack dogs which guarded the Crnkovic residence, an outstanding arrest warrant for Brian, Brian's prior history of abuse to his former wife, and Brian's constant maintenance of a loaded handgun. As a result of this action, provisional custody was awarded to Jason with visitation rights to Sandy "consisting of every other weekend ... beginning September 4, 1998 so long as said visitation takes place away from the home of Brian Crnkovic." This ruling was confirmed in further orders of the court in October 1998 and again in January 1999.
For the remainder of 1998 and throughout 1999, the evidence indicates that Sandy had little contact with Chase. Jason became employed, and at the time of trial, was preparing to move into his new residence in Stonewall. He earned $11.50 per hour and maintained health insurance for Chase. Although Jason allowed Chase to have continued visitation with Alex after August 1998, Sandy indicated that she and her father did not "see eye to eye." The few visits that Sandy exercised with Chase prior to the custody trial in March 2000 were at her mother's residence or at Sandy's place of employment. In November 1999, Sandy filed an answer to Jason's custody action wherein she also reconvened for the sole custody of Chase.
After the trial of these claims, the trial court awarded joint custody and designated Jason as domiciliary parent. Sandy's custody consisted of every other weekend, alternating holidays, and five weeks during the summer. In making the ruling, the trial court expressed concern for the guard dogs at the Crnkovic residence, stating:
"What bothered me was no one, you or your husband, neither one of you volunteeredI think the dogs arethere is some danger there and neither one of you said the dogs are unimportant. The *388 child is important. I'll get rid of the dogs or I'll move them. I never heard that and that bothers me."
The court also expressed concern regarding the parties' failure to communicate, which began at the time of Sandy's involvement with Brian. He particularly noted Sandy and Brian's "blocking" of telephone calls from Jason and Vicky. Sandy now appeals the award of custody and Jason's designation as domiciliary parent.

Discussion
The paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131; Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731. La. C.C. art. 134 sets forth the factors the court should consider when determining the best interest of the child, as follows:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
The court is not bound to make a mechanical evaluation of all of the statutory factors listed in La. C.C. art. 134, but should decide each case on its own facts in light of these factors. Gautreau v. Gautreau, 96-1548 (La.App. 3d Cir.6/18/97), 697 So.2d 1339, writ denied, 97-1939 (La.11/7/97), 703 So.2d 1272. The trial court is not bound to give more weight to one factor over another, and when determining the best interest of the child, the factors must be weighed and balanced in view of the evidence presented. Duvalle v. Duvalle, 27,271 (La.App.2d Cir.8/23/95), 660 So.2d 152; Warlick v. Warlick, 27,389 (La.App.2d Cir.9/29/95), 661 So.2d 706. A trial court's assessment of the probative value of evidence is accorded great weight and will not be disturbed absent a clear abuse of discretion. Hargrove v. Hargrove, 29,590 (La.App.2d Cir.5/9/97), 694 So.2d 645, writ denied, 97-1853 (La.10/31/97), 703 So.2d 24.
When parties are awarded joint custody, the court shall designate a domiciliary parent unless the implementation order provides otherwise or for other good cause shown. La. R.S. 9:335(B)(1). The naming of a domiciliary parent in the joint custody decree, without more, produces three legal results: (i) the child shall primarily reside with that parent; (ii) the other parent has physical custody during time periods that assure that the child has frequent and continuing contact with both *389 parents; and (iii) the decision making authority of La. R.S. 9:335(B)(3) applies. See Rigby, 1993 Custody and Child Support Legislation, 55 La.L.Rev. 103 (1994).
From our review of the record and the factors enumerated in Article 134, we agree with the trial court's assessment that both parties have shown their love for Chase. Chase has a strong emotional tie to each of his parents. Both parents have similar capacities to continue the rearing of the child and to provide for his material needs. Likewise, despite the conflict which developed in 1998, Jason and Sandy both testified at trial concerning their willingness and ability to facilitate and encourage a close and continuing relationship between Chase and the other parent.
The two factors from Article 134 which we view as justifications for the trial court's ruling in this case are factors 4 and 12. From the testimony, the trial court could conclude that the parties' relationships and the responsibility for the care and rearing of Chase were altered significantly in the two years preceding the trial. While Sandy maintained the primary responsibility for Chase prior to the spring of 1998, her situation changed upon the start of her relationship with Brian. The charges which Jason brought in his rule for provisional custody in August 1998 were not seriously and promptly challenged by Sandy. Sandy, who proceeded to marry Brian in October 1998, did not take steps to maintain a high level of responsibility for Chase during that time, and the court could conclude that Sandy neglected the exercise of her visitation privileges. The court expressed concern that Sandy never sought a responsible solution to the threat which Brian's dogs posed to a young child. At the same time, Jason's responsibility for Chase had greatly increased immediately before and after Sandy and Brian's relationship began. Jason likewise showed himself to be responsible in his employment. He testified that his relationship with Chase is the primary relationship in his life. Chase's excellent record at school demonstrates that the environment which Jason maintains for his son is beneficial. Also, while Sandy's relationship with Alex and Vicky has apparently also suffered during this time, Jason demonstrates his willingness to allow Chase to continue visitation with Sandy's parents. Finally, while Sandy's responsibility for and nurture of Chase were unquestionably greater than Jason's prior to the spring of 1998, we find from the record convincing evidence that Jason had always maintained an ongoing relationship with his son.
Sandy complains that the trial court's impression regarding Brian's dogs is not sufficient grounds to designate Jason as the domiciliary parent, particularly since the trial court's award of Sandy's joint custody rights was made without any restriction concerning the dogs. While we agree that the trial court's brief oral ruling focused primarily on the dog threat, we review judgments and not reasons for judgment. Harris v. Bancroft Bag, Inc., 30,431 (La.App.2d Cir.4/9/98), 714 So.2d 44, 49; Pine v. Doolittle, 28,141 (La.App.2d Cir. 6/26/96), 677 So.2d 686, writ denied, 96-2269 (La.5/30/97), 694 So.2d 240; Lubom v. L.J. Earnest, Inc., 579 So.2d 1174 (La.App. 2d Cir.1991). As discussed above, the trial court's judgment and its choice of Jason as domiciliary parent are supported by the record and the application of the factors enunciated in La. C.C. art. 134.

Conclusion
Based on the foregoing, the rulings of the trial court are hereby affirmed. Costs of these proceedings are assessed to appellant, Sandy Stockmon Crnkovic.
AFFIRMED.