847 So.2d 175 (2003)
James Hugh STEPHENSON, Sr., Plaintiff-Appellant,
v.
Nancy STEPHENSON, nee Savage, Defendant-Appellee.
No. 37,323-CA.
Court of Appeal of Louisiana, Second Circuit.
May 14, 2003.
*177 Donald L. Kneipp, Monroe, for Appellant.
Loomis & DeMent, by Albert E. Loomis, III, Jeffery L. Dement, Monroe, for Appellee.
Before GASKINS, CARAWAY and DREW, JJ.
CARAWAY, J.
In this child custody and support dispute, the trial court granted joint custody of the eight-year-old child to the parents, with the mother being designated the domiciliary parent and the father having frequent visitation. The trial court also awarded the mother interim spousal support of $900 per month from the date of demand until one-hundred eighty days after the judgment of divorce and child support. From these rulings, the father appeals. Finding no abuse of the trial court's discretion, we affirm.

Facts
James Hugh Stephenson, Sr. ("James") and Nancy Savage Stephenson ("Nancy") were married in 1991. Of the marriage, one son, James Hugh Stephenson, Jr. ("Jamie"), was born on August 15, 1994. Nancy's daughter from a previous marriage, Carolyn, also lived with the couple.[1] On July 19, 2001, James petitioned the court for a divorce from Nancy and requested his designation as domiciliary parent of Jamie under a joint custody plan.[2] Nancy answered and reconvened, requesting that she be awarded the primary care, custody and control of Jamie under a joint custody plan as well as child support. Nancy also sought interim periodic spousal support. During the pendency of the proceedings, the court rendered an interim order granting *178 alternating weekly interim custody of Jamie to the parties.
After a three-day hearing in March of 2002 on the issues of custody and support, the trial court orally granted the parties joint custody of Jamie and designated Nancy the primary domiciliary parent. A written judgment reflecting this ruling followed on July 17, 2002. The judgment granted James every other weekend and each Wednesday afternoon visitation during the school year and alternate weekly summer visitation.
In July, 2002, James sought a rehearing on the issue of child custody. In September, 2002, the trial court orally denied James's motion for rehearing and additionally rendered judgment on the issues of support. Specifically, the court awarded Nancy $900 per month as interim spousal support from the date of her reconventional demand until 180 days after the judgment of divorce. On October 10, 2002, the court rendered a written judgment affirming the earlier interim spousal support award and granting Nancy child support in the amount of $412.50 per month from July 25, 2001 until October 15, 2001, $209.76 per month from October 15, 2001 until March 21, 2002 and $545.79 per month after March 21,2002. From these judgments, this appeal ensued.

Child Custody
The paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131; Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731. La. C.C. art. 134 sets forth the factors the court should consider when determining the best interest of the child, as follows:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
% The court is not bound to make a mechanical evaluation of all of the statutory factors listed in La. C.C. art. 134, but should decide each case on its own facts in light of these factors. Rogers v. Stockmon, 34,327 (La.App.2d Cir.11/1/00), 780 So.2d 386. The trial court is not bound to give more weight to one factor over another, *179 and when determining the best interest of the child, the factors must be weighed and balanced in view of the evidence presented. Id. A trial court's assessment of the probative value of evidence is accorded great weight and will not be disturbed absent a clear abuse of discretion. Rogers, supra; Hodnett v. Hodnett, 36,532 (La. App.2d Cir.9/18/02), 827 So.2d 1205. The best interest of the child test under La. C.C. arts. 131 and 134 is a fact-intensive inquiry requiring the weighing and balancing of factors favoring or opposing custody in the competing parties on the basis of the evidence presented in each case. Hodnett, supra. Every child custody case is to be viewed on its own peculiar set of facts and the relationships involved, with the paramount goal of reaching a decision which is in the best interest of the child. Id.
La. R.S. 9:335(A)(2)(b) provides that to the extent feasible and in the best interest of the child, physical custody of the children should be shared equally. Yet, when the trial court finds that a decree of joint custody is in the best interest of the child, the statute does not necessarily require an equal sharing of physical custody. Hodnett, supra; Craft v. Craft, 35,785 (La.App.2d Cir.1/23/02), 805 So.2d 1213; Shaw v. Shaw, 30,613 (La.App.2d Cir.6/24/98), 714 So.2d 906, writs denied, 98-2414 (La.11/20/98), 729 So.2d 556, 98-2426 (La.11/20/98), 729 So.2d 558. Substantial time rather than strict equality of time is mandated by the legislative scheme providing for joint custody of children. Id.
When parties are awarded joint custody, the court shall designate a domiciliary parent unless the implementation order provides otherwise or for other good cause shown. La. R.S. 9:335(B)(1). The naming of a domiciliary parent in the joint custody decree, without more, produces three legal results: (i) the child shall primarily reside with that parent; (ii) the other parent has physical custody during time periods that assure that the child has frequent and continuing contact with both parents; and (iii) the decision making authority of La. R.S. 9:335(B)(3) applies. See Kenneth Rigby, 1993 Custody and Child Support Legislation, 55 La.L.Rev. 103 (1994). The domiciliary parent is the parent with whom the child primarily resides, but the other parent shall have physical custody during time periods that assure that the child has frequent and continuing contact with both parents. La. R.S. 9:335(B)(2). The implication of La. R.S. 9:335(B)(1) and (2) is that most joint custody decrees will invariably result in the child primarily residing with one parent more than the other. Nevertheless, the goal of joint custody is upheld so long as the non-domiciliary parent is assured of frequent and continuing contact with the child. Shaw, supra.
On appeal, James specifically argues that the trial court erred in designating Nancy as Jamie's domiciliary parent and, in the alternative, deprived him of visitation adequate to allow Jamie frequent and substantial contact with his father.
The matters of record show that after ten difficult years of marriage, James and Nancy physically separated in July of 2001. Throughout the marriage, James and Nancy entertained financial troubles. The couple moved to Monroe, Louisiana in 1992 and, there, Nancy received her college degree in general studies in 1993. After Jamie's birth in 1994, Nancy did not work outside of the home. Finally, in 1998, she worked as a part-time substitute teacher with the Monroe City Schools. From August 1999 to April of 2000 Nancy obtained a full-time non-certified fifth grade teaching position with a salary of $18,500 per year and medical insurance benefits. After quitting this position, she *180 remained unemployed until October of 2001, when she took her present position as a church financial secretary for which she earns $20,000 per year. She regularly attends the church where she works. Nancy's employment is located very close to Jamie's school and she is able to pick him up after school.
From the time Jamie was born, James worked as an insurance salesman which required that he travel during the week. In 1997, however, he was terminated from his position with State Farm Insurance Company due to sexual harassment charges arising from an affair with a married co-worker. He was able to quickly obtain other insurance employment and eventually began working for his present employer, Conseco, in October of 1998. His salary with Conseco is based upon commissions and he is responsible for paying his own expenses. By June of 2001, he accepted a position as manager with the company, but resigned that job by January of 2002 due to personal problems. In his first year with Conseco, James was named rookie of the year and was top salesman in 1999. In the four years that he has worked for the company, he has been named the top agent in the state and has ranked as a top salesman nationally.
Initially, James's job required him to be away from home approximately two to four nights twice a month. At the time of trial, James sold insurance and testified that he was able to work his schedule around Jamie. His territory covers the northern part of Louisiana and he can make day trips and come home at night. James's boss, Fred Tutt, testified that his position normally requires two to three days of travel a week, but that the schedule can be adjusted and travel limited.
James admitted that during the marriage, he was treated for depression and took medication for the condition as recently as 2001. He admitted that he had suicidal thoughts although he never acted on them and had considered using a gun. He also acknowledged that separate sexual harassment charges were filed against him in California and that he periodically possesses and views pornographic magazines and internet websites, although he claims that Jamie was never exposed to such material.
Various neighbors and friends of the couple also testified at the hearing. The consensus of that testimony indicated that both parents love Jamie and were attentive to his needs. Notably, each of James's witnesses also expressed positive regard for Nancy's maternal abilities. Nancy's witnesses were not so complimentary to James, although Susan Handy, a friend of the couple, conceded that Jamie and his father appeared to have a close relationship and that Jamie appeared to love his dad. Liz Hammett and Gloria Steele, good friends of Nancy, confirmed that during the marriage James traveled quite a lot. Both characterized James as controlling.
Two experts also testified. Bobby Stephenson, an expert psychologist, stated that he saw both Nancy and James professionally about five years before trial. James exhibited symptoms of depression at that time including tiredness, low energy, decreased appetite and sadness. He last saw the Stephenson family in March of 1997. Dr. James Dean Stockstill, an expert in family practice, first saw James for depression from 1995 until early 1997. However, in July, 2001, James returned to Dr. Stockstill complaining of depression symptoms relating to his divorce. James received an anti-depressant at that time, but never returned to the doctor for further treatment.
From this evidence, the court awarded domiciliary status to Nancy and granted *181 James frequent visitation rights. Of the eight, relevant factors considered under Article 134, the court found that seven weighed in favor of the mother. In fashioning the custody ruling, the court specifically expressed concern over the spending habits of James as well as his moral fitness, mental and physical health and narcissistic and controlling tendencies. Additionally, the court found Nancy to have been Jamie's primary care giver during the marriage and that she provided the child with a sense of stability. Finally, the court considered as an important factor the close relationship that Jamie had with his step-sister.
We can find no abuse of discretion in the custody determination appointing Nancy domiciliary parent. James admitted at trial that the interim equal custody award affected Jamie negatively. When questioned regarding Jamie's adjustment to the interim alternating weekly custody, James stated that "by the time he really gets even with it, gets calm with it, it's time to switch. Its time to go back and so there's this shifting that the little guy is always in." Undoubtedly, even James felt that Jamie needed more stability, conceding that Jamie's grades had dropped during the alternating interim custody period. The record clearly shows that, in his present position, James is still required to travel out of town during the week. Although the record suggests that he has been moderately successful in working his schedule around Jamie and would be able to come home after day trips, the fact remains that James is still frequently required to be out of town during the week when Jamie is in school. Certainly, it is during the school year that stability and continuity are of utmost importance to an eight-year old's well-being and school performance. Also relevant in this matter is Jamie's stability through his continued residence with his sister Carolyn with whom he was raised and shares a close relationship. Finally, the symptoms of James's bouts of depression, i.e. lack of motivation, tiredness, lack of sleep, oversleeping, while apparently less frequent at the time of trial, nevertheless remain a concern insofar as they relate to the day to day care of an eight-year-old child. For these reasons, we find that it is in Jamie's best interest to primarily reside with Nancy.
For the same reasons, we cannot say that an increase in visitation is warranted. James argues that the overnight visitation award amounts to less than 100 days of visitation yearly. He characterized this amount of visitation time as "grossly insufficient" given the fact that both parents live in Monroe. The summertime custody allows alternate weekly visitation. Therefore, it is only during the school year that James's visitation has been restricted. Nevertheless, even during the school year, James is allowed weekly physical contact with Jamie which is adequate to assure the required contact with Jamie. At the same time, Jamie's best interest is served by the stability he receives in Nancy's home during the school week.
There is no requirement in our law that every joint custody plan award the non-domiciliary parent 100 days or more of overnight physical custody in order to ensure frequent and continuing contact. The legislative amendments to La. R.S. 9:335 in 1995 demonstrate that more flexibility in shaping the sharing of custody was intended. Act 463 of 1995; Shaw, supra at 910. Every child custody case must be viewed on its own peculiar set of facts and relationships involved, with the paramount goal of reaching a decision which is in the best interest of the child. Wilson v. Wilson, 30,445 (La.App.2d Cir.4/9/98), 714 So.2d 35. The present visitation scheme *182 achieves that goal under the unique circumstances of this case.

Child Support
In support of their child support positions, each party submitted affidavits of personal expenses and income. Because James was self-employed, he also submitted business expense calculations into evidence. The trial court found that James had overstated both his personal and business expenses and that Nancy was not voluntarily unemployed for the three months prior to obtaining her present employment. James disputes these findings.
Fathers and mothers, by the very act of marrying, contract together the obligation of supporting, maintaining, and educating their children. La. C.C. art. 227. Both parents are obligated to contribute to the support of children. Schelldorf v. Schelldorf, 568 So.2d 168 (La.App. 2d Cir.1990); Osborne v. Osborne, 512 So.2d 645 (La.App. 2d Cir.1987). Children are entitled to support in an amount sufficient to maintain them in a style commensurate with the standard of living the family enjoyed before the marriage terminated. Schelldorf, supra. When reviewing an award of child support, an appellate court will not overturn the trial court's factual determinations unless, in light of the record taken as a whole, they are manifestly erroneous or clearly wrong. Havener v. Havener, 29,785 (La.App.2d Cir.8/20/97), 700 So.2d 533.
The child support guidelines are set forth in La. R.S. 9:315, et seq., and are to be used in any proceeding to establish or modify child support. The measurement of "gross income" for determining the monthly amount of child support is set forth in La. R.S. 9:315(4).[3] From this statutory guidance, the self-employed individual is entitled to deduct from the gross receipts of his business only those "ordinary and necessary expenses required to produce income."
In this matter, the court divided the child support award into three separate awards. The first award included the time period from July, 25, 2001 until October 1, 2001 when custody was equally shared and Nancy was unemployed. The second period encompassed October 2, 2001 until March 21, 2002 when custody was shared and Nancy was employed. Thereafter, the award was for the final joint custody arrangement with both parents being employed.
For all of the child support awards, Nancy calculated James's monthly adjusted gross income at $3,719.13 or a yearly income of $44,629.64. For the first period Nancy claimed no income for herself while James computed her income at $1,416.66 or a yearly earning potential of $17,000; both parties agreed that Nancy's income for the second and third award periods was $1,666.66 or $20,000 a year. To the contrary, for all three periods, James measured his monthly adjusted gross income at $3,088.94 or a yearly income of $37,067.32.
To assist the court in calculating his 2001 gross income, James introduced tax records into evidence which reflected a gross yearly salary of $60,116.84.[4] However, because he was considered self-employed, he deducted business expenses from this sum in the amount of $23,049.52. The business expenses included charges for cell phone, motels, meals, copies, gifts, supplies and mileage. Thus, for 2001, *183 James calculated his gross income for support at $37,067.32.
In determining his income, however, the trial court questioned certain of the above-claimed business expenses as "excessive" and "tremendously inflated." Regarding the personal expenses claimed by James, the court also described the amount of money spent on entertainment and dining out as "absolutely incredible." Indeed, James estimated spending $4,800 per year on these personal expense categories despite the frequent time he spent on the road for his employment. The court also observed that incidentals and groceries listed as personal expenses in the yearly amount of $5,400 were hard to believe in light of the fact that James claimed to eat out all of the time. The court also rejected a $250 per month or $3,000 yearly loan expense finding that the money James received from his parents was not intended to be a loan. Finally, the court found that James was not credible regarding his current income. In calculating the yearly income of James at $3,719.16 per month or $44,629.64 per year, the amount utilized by Nancy in her child support calculations, the court characterized this income amount as "very generous" in favor of James.[5]
We can discern no manifest error in the court's conclusions. At trial, James admitted that he earned more money than that which he reported to the Internal Revenue Service. From this testimony, the court could reasonably conclude that James was not completely forthcoming about his actual earnings. The record also supports the court's conclusions regarding the unreasonableness of the expenses reported by James. It is well-settled Louisiana law that it is within the trial court's discretion to determine what is an inappropriate expense when determining gross income for purposes of calculating child support. Verges v. Verges, 01-0208 (La.App. 1st Cir.3/28/02), 815 So.2d 356, writ denied, 02-1528 (La.9/20/02), 825 So.2d 1179; Hudnall v. Hudnall, 00-0330 (La.App. 1st Cir.5/11/01), 808 So.2d 641; State in the Interest of Penn v. Penn, 97-1269 (La. App. 1st Cir.5/15/98), 712 So.2d 625. Therefore, we find no abuse of discretion in either the court's determination that the personal and business expenses were inappropriate or in her calculation of income after a reasonable reduction of these expenses.
Citing La. R.S. 9:315.9,[6] James also contends that because Nancy turned down a $17,000 a year job offer in June of 2001, for no apparent reason, her potential income due to her voluntary unemployment should be utilized for the period of July 2001 to October 2001, when she obtained her present employment.
Income under La. R.S. 9:315 includes the potential income of a voluntarily unemployed or underemployed party. Voluntary unemployment or underemployment for the purposes of calculating child support is a question of good faith on the obligor-spouse. State v. Battson, 36,336 (La.App.2d Cir.9/18/02), 828 So.2d 132. *184 A party is not deemed voluntarily unemployed or underemployed if he or she is absolutely unemployable or incapable of being employed, or if the unemployment or underemployment results through no fault or neglect of the party. Id. Voluntary underemployment is a fact-driven consideration. On this issue, the trial court has broad discretion in determining the credibility of witnesses and its factual determinations will not be disturbed on appeal absent a showing of manifest error. Id.
In this case, Nancy admitted that she had declined a job offer in May or June of 2001. However, she indicated that the decision not to take the job was a mutual one made by the couple before their separation. Nancy also testified that James was very inconsistent in his desire for her to work and would alternate between putting pressure on her to either get a job or to stay home. Obviously, the trial court accepted Nancy's reason for declining employment in June of 2001. We decline to disturb this credibility determination as it relates to the issue of her unemployment and find no manifest error in the court's conclusion.

Interim Spousal Support
On the issue of the $900 monthly spousal support award, James reiterates his complaint regarding the calculation of expenses and Nancy's alleged voluntary unemployment. Additionally, he contends that the trial court improperly failed to consider that Nancy's income was sufficient for her support and that he had no ability to pay after all of his monthly expenses were paid from his income.
The Louisiana Civil Code's spousal support articles were amended in 1997 by La. Acts No. 1078, Regular Session, and went into effect on January 1, 1998. Pursuant to these amendments, the terms alimony pendente lite and permanent alimony were eliminated, and the terms interim and final periodic spousal support were substituted. La. C.C. art. 111 and its Revision Comments1997(a); Kenneth Rigby, The 1997 Spousal Support Act, 58 La. L.Rev. 887 (1998). See also, Thomey v. Thomey, 33,000 (La.App.2d Cir.4/7/00), 756 So.2d 698. The purpose of interim spousal support is to maintain the status quo without unnecessary economic dislocation until a final determination of support can be made and until a period of time of adjustment elapses that does not exceed, as a general rule, 180 days after the judgment of divorce. Defatta v. Defatta, 32,636, 32,637 (La.App.2d Cir.2/1/00), 750 So.2d 503; Reeves v. Reeves, 36,259 (La.App.2d Cir.7/24/02), 823 So.2d 1023. The trial court is afforded much discretion in determining an award of interim spousal support and that award will not be disturbed absent a clear abuse of discretion. Id.
From our review of the record, we find no error in the $900 monthly interim spousal support award. As we noted above, the actual income of James is difficult to calculate. We also agree with the trial court's evaluation of James's income as patently understated. Except for a short time of employment during the marriage, Nancy remained unemployed until after the parties' separation, when she began earning $1,666.00 per month. Therefore, from the time of the separation, Nancy experienced a substantial decrease in the standard of living she enjoyed while living with James. Considering the interim spousal support policy of maintaining the status quo during the transitory period from marriage to divorce, Nancy is entitled to interim spousal support to offset the significant disparity between the parties' income. Moreover, when reasonable monthly personal expenses and James's child support obligation are subtracted from his income, the $900 per month obligation *185 imposed by the trial court is well within his means to pay. We find no abuse of the trial court's award.

Conclusion
For the reasons stated above, we affirm the judgment of the trial court. Costs of this appeal are assessed to James.
AFFIRMED.
NOTES
[1] At the time of the child custody hearing, Carolyn was fourteen years old.
[2] A judgment of divorce was granted on March 18, 2002.
[3] This provision is now contained in La. R.S. 9:315(C)(4) as amended in 2001 and applicable to actions filed after August 15, 2001.
[4] At the time of trial, James had not yet filed either his 2000 or 2001 tax returns.
[5] Indeed, our review of the record shows that the trial court would have been justified in excluding other expenses listed by James in his affidavit thereby possibly increasing his income even more. Notably, all of the expenses listed therein included Jamie's monthly expenses. Additionally, other expenses that were duplicated by the parties included Nancy's automobile insurance, Jamie's school lunches, allowance and certain extracurricular fees. Finally, the expense category of "non-reimbursable" business expenses replicated previous income deductions.
[6] This article was redesignated as La. R.S. 9:315.11 by Acts 2001, No. 1082 which applies to actions filed after August 15,2001.