NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

20-355

KALI W. HOUSE

VERSUS

RICHARD HOUSE

**********

APPEAL FROM THE
THIRTEITH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 96168
HONORABLE SCOTT WESTERCHIL, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of Sylvia R. Cooks, Chief Judge, Elizabeth A. Pickett and Shannon J. Gremillion, Judges.

AFFIRMED.

Cooks, C.J., dissents and assigns written reasons.

Bradford H. Felder
Veazey, Felder & Renegar, LLC
P.O. Box 80948
2nd Flagg Place: Lafayette, LA 70508
(337) 234-5350
COUNSEL FOR PLAINTIFF /APPELLANT:
    Kali W. House

**Jack L. Simms, Jr.**
**P. O. Box 1554**
**100 East Texas Street**
**Leesville, LA 71496**
**(337) 238-9393**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Richard House**

**PICKETT, Judge.**

## FACTS

Kali House (Kali) and Richard House (Richard) separated on September 20, 2017. The couple's daughter, Rowan, was not yet two months old at the time. On August 20, 2018, Kali and Richard agreed upon joint legal custody and entered into a stipulated judgment on September 27, 2018, in which the parents agreed to a visitation schedule and the designation of Kali as domiciliary parent, all as reflected in the "Implementation Plan for Joint Custody" attached thereto. Judgment of divorce was signed on December 6, 2018.

On April 3, 2019, Kali filed a Rule for Contempt and for Modification of Custody based on allegations that Richard had not returned Rowan as scheduled and that he was leaving for Hawaii on military assignment. The trial court set a hearing for May 30, 2019. Richard filed a petition on May 7, 2019, seeking modification of the stipulated custody decree alleging that Kyle Cauble (Cauble), Kali's husband at that time, had physically abused Rowan. He also set forth, as an additional basis for his petition, the allegation that Kali's home environment was unstable because she had filed for divorce from Cauble. Further, he alleged that he was in the military and had been transferred to Hawaii. That matter was also set to be heard on May 30, 2019, but Richard was granted a continuance on May 16, 2019, resetting the matter for August 29, 2019.

On July 7, 2019, Kali filed a Motion to Modify Child Support alleging that the parties are no longer able to share physical custody 50/50 because of Richard's reassignment to Hawaii, Kali's daycare cost for Rowan would be increased to $600.00 a month, and because "Plaintiff [Kali] is the only parent providing for the minor child physically, mentally and financially." On July 8, 2019, the trial court set this matter for the August 29, 2019 hearing date already in place for this case.

While the August 29, 2019 hearing transcript is not in the record, it is clear from the September 30, 2019 hearing transcript that the trial court maintained custody with Kali, with the condition that the child remain in Vernon Parish. On September 4, 2019, Richard filed a First Supplemental and Amended Petition and Rule for Modification of Custody and Petition for Ex Parte Order of Temporary Custody on September 4, 2019, alleging as the basis for the ex parte order "[a]ll of the allegations set forth by Richard House in the original petition filed herein." Richard attached to his *ex parte* petition his affidavit and the affidavit of Cyla Hall (Hall). Richard alleged that on August 31, 2019, Kali took Rowan to Forth Worth, Texas. Richard asserted that "irreparable harm to the minor child could result in a delay, and, that no visitation be exercised by defendant-in-rule, Kali House (Cauble), during the pendency of these proceedings." On that same day, September 4, 2019, the trial court granted an *ex parte* order awarding immediate temporary custody of Rowan to Richard and prohibiting any visitation by Kali. The trial court also ordered that Richard's custody be exercised only in Vernon Parish, Louisiana. The trial court then set a hearing date for September 30, 2019, to determine whether the *ex parte* order should be made permanent.

On September 30, 2019, the trial court, after contradictory hearing, issued a Judgment of Temporary Custody ordering that Richard have physical custody of Rowan and allowing Richard to "temporarily relocate the child's domicile to the State of Hawaii, until further orders of [the] court." The trial court also set a hearing date of October 31, 2019, to address the issues of Rowan's permanent domicile and modification of the original stipulated custody decree. On September 30, 2019, Kali's attorney withdrew from the case. On October 29, 2019, a new attorney enrolled as counsel for Kali and consequently the trial court reset the hearing date to December 9, 2019.

2

Trial on the matter was held on December 9, 2019. After the presentation of evidence and testimony the trial court rendered judgment, signed on February 14, 2020, awarding joint legal custody of Rowan to Richard and Kali and designating Richard as domiciliary parent. The trial court further ordered Kali have visitation with Rowan under a new Implementation Plan for Joint Custody. The trial court also ordered "in the event that Richard House is deployed to a non-dependent duty station then Kali House shall have the custody of the child until the deployment is over." The court additionally ordered that Rowan have no contact with Cauble. Kali timely appealed the judgment of the trial court asserting Richard failed to prove "a material change in circumstances warranting a modification of custody" and alternatively maintains the trial court "failed to properly apply the Civil Code Article 134 factors" in removing Kali as domiciliary parent. Kali further asserts the trial court erred in allowing "only six weeks of custodial time in the summer for Kali."

## ASSIGNMENTS OF ERROR

On appeal, Kali asserts three assignments of error:

1. The trial court erred in finding a material change in circumstances warranting a modification of custody.

2. Alternatively, the trial court erred when it failed to properly apply the Civil Code Article 134 factors to maintain Kali as the domiciliary parent and award Richard appropriate custodial periods given his move to Hawaii.

3. In the further alternative, the trial court erred when it alternated holiday periods and allowed only six weeks of custodial time in the summer for Kali.

3

## DISCUSSION

There is no dispute here that the parties previously agreed to a stipulated judgment establishing joint legal custody and making Kali the domiciliary parent of Rowan.

> In an action to modify a custody decree, the trial court must first determine whether the decree is a considered decree or a consent decree. *See Moss,* 104 So.3d 807. "A consent judgment is a bilateral contract[.]" *Burns v. Burns,* 17-343, p. 6 (La.App. 1 Cir. 11/3/17), 236 So.3d 571, 575. When the underlying decree is a stipulated judgment (i.e., no evidence of parental fitness was taken by the court), the moving party has the burden of proving that a material change in circumstances has occurred since rendition of the underlying decree, and that the modification will be in the child's best interest. *See Evans*, 708 So.2d 731. Elaborating on this twofold burden of proof, this court stated in *Prather v. McLaughlin*, 16-604, p. 5 (La.App. 3 Cir. 11/2/16), 207 So.3d 581, 585:
>
>> However, in order to achieve stability and avoid continuous litigation, our courts . . . have also added an additional condition on a parent who wishes to modify a prior stipulated joint custody decree—proof that there has been a material change in circumstance since the last decree warranting a change in custody [and] that the court finds it is in the best interest of the child. Some courts have held that for a material change of circumstances to be "sufficient to alter the custody plan . . . the material change of circumstances 'must ***be of a substantial and continuing nature to make the terms of the initial decree unreasonable.***'" *Tarver v. Tarver*, 15-219 (La.App. 3 Cir. 10/7/15) [2015 WL 5837655] (unpublished opinion) (citing Linda D. Elrod, Child Custody Practice and Procedure § 17:5 (database updated 2015).
>>
>> . . . .
>
> Moreover, "the ultimate question which must be answered is whether the change in circumstances will negatively impact the welfare of the child." *LeBlanc v. LeBlanc*, 06-1052, p. 9 (La.App. 3 Cir. 2/14/07), 951 So.2d 500, 507, *writ denied*, 07-562 (La. 4/5/07), 954 So.2d 146.
>
> Should the party urging a change of the physical custody allocation of a joint custody plan fail to show a material change in circumstances, the inquiry ends, and there is no basis for altering the consent judgment. *Lunney v. Lunney*, 11-1891 (La.App. 1 Cir. 2/10/12), 91 So.3d 350, *writ denied*, 12-610 (La. 4/4/12), 85 So.3d 130.

4

*Joubert v. Joubert*, 19-349, pp. 5-6, (La. App. 3 Cir. 11/13/19), 285 So. 3d 7, 12-13 (emphasis added). "A trial court's determination regarding child custody is to be afforded great deference on appeal and will not be disturbed absent a clear abuse of discretion." *Franklin v. Franklin*, 99-1738, p. 4 (La.App. 3 Cir. 5/24/00), 763 So.2d 759, 762. "[T]he trial court is given vast discretion in custody matters because the trial court has a better capacity than the appellate court to evaluate the testimony and credibility of witnesses." *Page v. Page*, 96-69, p. 2 (La.App. 3 Cir. 5/8/96), 673 So.2d 1317, 1319.

In this case, the trial court did not explicitly find that Richard proved a material change in circumstances sufficient to warrant a change in the custody plan. However, the court's ruling reflects an implied finding that Richard's transfer to a duty station in Hawaii and Kali's relocation to Dallas clearly establish a material change in circumstance which make the previous custody arrangement unworkable. Thus, we find that the record does support a finding of a material change of circumstances of a substantial and continuing nature sufficient to make the terms of the initial decree unreasonable. We find no merit in the first assignment of error.

The trial court further found that Kali's husband, Mr. Cauble, abused Rowan, yet Kali continued living with him. While the trial court found that Kali never abused her daughter, it found that her continued relationship with Mr. Cauble constituted poor judgment and reflected badly on her parenting skills. While the trial court maintained joint custody, it named Richard as domiciliary parent, subject to visitation with Kali. The evidence supports the trial court's determination that it is in the best interest of Rowan to name Richard as domiciliary parent. The trial court properly enunciated the factors listed in La.Civ.Code art. 134. We find no abuse of discretion in the trial court's judgment. The second assignment of error lacks merit.

In a joint custody decree and implementation order, "[t]o the extent feasible and in the best interest of the child, physical custody of the children should be shared equally." La.R.S. 9:335(A)(2)(b). This provision does not mandate fifty-fifty sharing of actual physical custody. Of paramount importance is the best interest of the children, taking into consideration the ages of the children, the parental situation, and other factors relevant to the issue of child custody. *Brown v. Brown*, 96-743 (La.App. 3 Cir. 2/26/97); 692 So.2d 458. Each case must be decided on its unique circumstances with reference to the best interest of the children. On review, the trial court's decree of joint custody will not be disturbed absent a clear showing of abuse of discretion. *Id.*

*Saucier v. Saucier*, 98-659, pp. 10-11 (La.App. 3 Cir. 10/7/98), 719 So.2d 702, 707.

Kali asserts that the visitation granted to her by the trial court is inadequate. She claims that the trial court erred by allowing her to have visitation only on alternating holidays and six weeks in the summer. In setting the visitation arrangements, the trial court considered the lengthy travel, and the expense thereof, required from Hawaii. The trial court ordered Richard to arrange for visitation with Kali any time he returned to the continental United States. It further ordered that the visitation schedule be reevaluated when Richard is transferred to a new location. Given the vast discretion afforded to the trial court, we find no error in the visitation schedule.

## CONCLUSION

We affirm the judgment of the trial court in all respects. All costs of this appeal are assessed against Kali House Cauble.

**AFFIRMED.**

6

KALI W. HOUSE

VERSUS

RICHARD HOUSE

**COOKS, Chief Judge, dissents.**

The majority concedes that "the trial court did not make an explicit finding that Richard proved a material change in circumstances sufficient to alter a change in the custody plan" but maintains the trial court's ruling "reflects an *implied* finding" that Richard's relocation by the military to Hawaii establishes a material change in circumstances. But nowhere in the jurisprudence do I find support for an implied finding being a sufficient basis for the trial court to proceed to the second step in the process, the determination of the best interest of the child. The majority cites this court's decision in *Joubert* but does not adhere to its precepts. In *Joubert* we clearly held that:

> **Should the party urging a change of the physical custody allocation of a joint custody plan fail to show a material change in circumstances, the inquiry ends, and there is no basis for altering the consent judgment.** *Lunney v. Lunney*, 11-1891 (La.App. 1 Cir. 2/10/12), 91 So.3d 350, *writ denied*, 12-610 (La. 4/4/12), 85 So.3d 130.

*Joubert v. Joubert*, 19-349, pgs. 5-6, (La. App. 3 Cir. 11/13/19), 285 So. 3d 7, 12–13 (emphasis added). *See* also *Delhoste v. Delhoste*, 16-983 (La.App. 3 Cir. 5/22/17), 222 So. 3d 136 and cases cited therein. The father's move to Hawaii certainly presents visitation issues but it provides no basis for changing the agreed-upon domiciliary custody arrangement designating Kali as the domiciliary parent. Richard does not establish a basis for the trial court or this court to change the existing decree.

*The record reflects the trial court did not find that Richard proved a material change in circumstances sufficient to alter a change in the custody plan.* Nevertheless, without making such finding, the trial court proceeded to address the best interest of the child. It was error for the trial court to proceed with a determination of the best interest of the child. Thus, the inquiry should have stopped there. Even if it were proper to proceed with a best interest of the child analysis, I believe the record does not support a change of domiciliary custody. Because the trial court legally erred in proceeding to the determination of best interest of the child before establishing the first prong of the test we must review the matter *de novo*.

> [W]hen a trial court applies incorrect legal principles and these errors materially affect the outcome of a case and deprive a party of substantial rights, legal error occurs. *Evans v. Lungrin*, 97-541, 97-577 (La. 2/6/98), 708 So.2d 731. "[W]here one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence." *Id.* at 735.

*Joubert*, 285 So. 3d at 11.

This child is only two and a half years old, and for the first year of her life she bonded only with her mother because her father was unavailable for most of the first twelve months of her life. The primary basis alleged by Richard to establish a change of circumstances was one instance of alleged abuse by the mother's husband at the time, Mr. Cauble. The majority maintains that "the trial court [] found that Kali's husband, Mr. Cauble, abused Rowan, and yet Kali continued living with Mr. Cauble." *The record does not support this statement.* **Richard testified at the hearing** *he no longer believes* *Cauble abused the child.*

Q. Sir, we—had a deposition earlier this month, is that correct?

A. That's correct, we did.

Q. Okay. In that deposition I asked you if you had stated to Mr. Cauble that—that you do not believe that he did anything?

A. Yeah, I made that statement.

Q. Do you still stand by that statement?

A. I stand by that statement. I don't think he did do it.

Q. You don't think he's abused this child at all?

A. I think he knew about it.

Unable to establish any abuse by Cauble, Richard testified he now thinks it is Kali who abused their child despite his contradictory testimony that he personally has never seen Kali spank Rowan or act aggressively toward her. There is no medical evidence to support either of Richard's accusations and in fact, the only medical evidence presented says there are no indications of any emotional or physical abuse of Rowan. The majority agrees that the trial court was correct in finding that Kali did not abuse her child.

Additionally, Kali filed for a divorce from her second husband and she testified the divorce was in progress at the time of the hearing awaiting expiration of the legal time delay before a judgment of divorce can be awarded. Kali testified that when she realized her then husband may well have physically abused the child on one occasion, she separated from him, subsequently filed for divorce, and no longer has any contact with him.

Richard also alleges Kali continued to see Cauble after filing for divorce from him but in his *ex parte* petition for custody he states as a basis for his petition that Kali's home environment is unstable because she was divorcing Cauble and is no longer in a stable environment. Richard cannot have it both ways. In short, there was simply no evidentiary basis for the trial court to find that Cauble abused the child and the majority's effort to breathe life into this assertion is clear error.

Further, the trial court's findings and rulings are internally inconsistent. Although the trial court indicates it found the testimony of Cyla Hall (Hall) and Makayla Clayton (Clayton) credible, it found Rowan was not physically abused or

neglected by Kali and permitted her to have unsupervised visitation with Rowan henceforth. Moreover, it further provided Kali shall enjoy full physical custody of Rowan in the event Richard is reassigned to a post where he cannot bring his children. The inclusion of that provision in the trial court's order speaks volumes about Kali's continued fitness to be the domiciliary parent and belies any notion of abuse or change of circumstances. The majority ignores this inconsistency.

Arial Leggett (Leggett) testified at the hearing. She babysat Rowan on occasion for Kali and does not have any relationship with Hall, Clayton, Richard, or Cauble. Her only relationship to Kali is that she has babysat for her on a few occasions. She testified that Kali brought Rowan to her on August 24, 2019, and she babysat her from about 12:15 P.M. to about 5:00/6:00 P.M. Hall picked up Rowan from her around 6:00 P.M. She tells a very different story concerning Rowan's condition on that date than does Hall.

> Q. Now, from 12:15 to 5:30/6:00, you had Rowan. Did she appear in good health?
>
> A. Yes, definitely.
>
> Q. Okay, and did she—she appear bruised?
>
> A. Not at all.
>
> Q. Okay, did she appear sick?
>
> A. Not at all. She fed my baby.
>
> Q. She fed your child?
>
> A. Yes.
>
> Q. Was she throwing up?
>
> A. No.
>
> Q. Did she have a fever?
>
> A. No, sir.
>
> Q. Did you have to give her Tylenol or anything to that effect?

4

A. Oh no.  Huh-uh (negative).

Q. Would you have put her around—now, you mentioned that you had a baby?

A. Uh-huh (affirmative).

Q. That child, how old is that child?

A. My baby was born July 27th.  She [Rowan] came on August 24th, so my baby's two months old.

. . . .

Q. Would you have had a sick child around your baby?

A. Not at all.

Q. Now, we're speaking about August 24th?

A. Uh-huh (affirmative)

Q. And how did—how did Rowan appear aside from her health?

A. She—she got there and she was like, totally happy.   Like, she was playing, she was watching TV, she was—we went to McDonalds, she ate.  She ate apple pie, she ate nuggets, she ate fries, she fed my baby.  She played like a normal baby, like a normal kid.  Nothing was wrong with her at all.

Q. Okay, and at 5:30/6:00 that day, did you have any further actions with this child?

A. No.

Q. Okay.

A. She was completely healthy.

Q. In regard to Cyla Hall, have you ever met her before?

A. No, I have—I don't know—I don't know who she is.

Q. Did you allow her to pick up the child because you were told to?

A. Yes, because Kali gave me permission to give her to—give Rowan to her.

Q. Okay, and aside from that chance encounter, you don't know her, couldn't call her, talk to her, or anything?

A. No, not at all.

5

*This testimony is consistent with Kali's testimony regarding the same series of events.* Kali testified that when Hall picked up Rowan on August 24, 2019, she had her for only about an hour then Richard picked her up. The next day, August 25, 2019, Richard brought Rowan back to Hall to babysit her until Kali returned from her birthday weekend in Mississippi. Consistent with Leggett's testimony, Kali testified regarding this time frame as follows.

Q. All right, during that weekend while you were gone, did Mrs. Hall attempt to contact you and tell you that the child was sick?

A. She texted me one time and told me that she had to give Rowan some Tylenol and then she said that she gave her a bath and went to bed and she was fine. She never expressed any sickness. But the next day she told me that Rowan was acting sick and my husband was there whenever she said that she was gonna make up that Rowan was sick so that I would hurry up and come home and get her. So—whenever I viewed Rowan that day, she was not sick. She had no runny nose, no cough, there was absolutely nothing wrong with the child.

. . . .

A. The next day I came home whenever she told me, but we were in Natchez, Mississippi, so it took us about four hours to get home. I came home as soon as she told me that.

Hall testified she has known Kali since March of 2018. She would see Kali and Rowan about once a week until August of 2019. She recounted that Kali and Rowan spent the night at her home on August 23, 2019, Kali's birthday weekend. Hall described Rowan's condition at that time quite differently than Leggett and Kali.

A. She got to my house at 5:30 and walked in my house and asked where my fingernail polish was and my fingernail polish remover. I directed her to under my cabinet in my bathroom where my polish was. She went and sat on my couch and Rowan, it was—she was obviously sick from whenever she got out of the car. She had a snotty nose, she was coughing. I changed her diaper later that night, she had diarrhea. I did not check her temperature, but she felt feverish from her forehead. She sat on the couch and Rowan expressed to Kali that she wanted her diaper to be changed and Rowan was like holding her diaper, was starting to cry, and at this point she had—Rowan was acting like she wanted to be held, so she climbed on Kali and Kali freaked the hell out because she was messing up her nails. She was painting her nails.

Q. She—you said she climbed over into—

6

A. Kali's lap.

Q. –Kali's lap and what, if anything, did Kali do?

A. She picked up Rowan and all the while screaming that she, excuse my French, I fucking hate you, I hate you, and she picked up Rowan by her arm and was swinging her hand, not hitting her with her fingers, but her palm and hit her on the back of the head, swung and hit her on the mouth and then struck her on her lower back and Rowan was kicking and screaming to get away from her.

Q. All right. What was the outcome of that altercation? What—what eventually happened? Did she just stop or what?

A. She—I was hollering at her. I told her, Kali, I was like you're not in your right mind set. Go for an "F'ing" walk or go to take a bath and she did. She went to take a bath or a shower.

Q. All right, and where was Rowan when Kali left to take a bath?

A. She was with me, I held her.

Q. Did you change her diaper?

A. Yes, sir.

Q. Okay, After Kali had finished taking her bath, did—what did she do?

A. Before she went to take her bath because I hollered at her to go do either one, my son was—I was fixing his bottle. I went in my kitchen to finish fixing his bottle, putting him down for bed. He was asleep at this point and Rowan was still screaming form what happened. Kali walked over to Rowan, covered her nose and her mouth and Rowan's eyes like—shot open like she could not breathe and then Kali slammed her face into the middle of my sectional three times, still while screaming that she hates her and then she went to take a shower or a bath.

. . . .

A. I brought Rowan to bed and I put her down for the night.

Hall testified that Rowan slept through the night. According to her testimony, the next morning after everyone awoke, Kali again physically mistreated Rowan.

A. The next day when we got up and Kali had fallen asleep with her nails wet and they messed up, so she got up to refix them, was sitting on the couch, all of our children are downstairs, William and Rowan, and Rowan, at this point her sickness like progressed, so she went to Kali to be held again and Kali like stepped back from my couch and took her and threw her into my couch. Still while—

Q. She did what now? I didn't understand that.

7

A. She picked up Rowan and threw her into my couch and Rowan's like shoulders and head like bounced off like a picture of a car wreck. That's what it looked like. She was—she fell hard into the couch.

*Despite the seriousness of the alleged mistreatment Hall did not notify any authority of this alleged incident nor did she call Cauble or Richard.* When asked if Hall had ever seen Kali treat Rowan like this before she responded "No." Thus, for the more than one year that Hall saw Kali and Rowan on a weekly basis she could not recall any other example of Kali mistreating Rowan. Hall also testified that Kali took Rowan to the babysitter, Leggett, the next day as both Kali and Leggett maintained. Hall's description of Rowan as being very ill is in direct contrast to Leggett and Kali's testimony. Nothing casts any doubt on the veracity of Leggett's testimony which is entirely consistent with Kali's version. But Hall's account of these events does not ring true and is contradicted by the medical evidence. Apparently, the trial court was not persuaded that Kali engaged in such mistreatment of Rowan, otherwise it would not have allowed Kali unsupervised visitation with Rowan and it would not have made her domiciliary parent in the event Richard is unable to be with Rowan due to any new deployment. The majority ignores this and simply says:

While the trial court further found that Kali never abused her daughter, he found that her continued relationship with Cauble constituted poor judgment and reflected badly on her parenting skills.

As I read the record, I do not discern that the trial court found there was a continued relationship with Kali and Cauble. The testimony demonstrates otherwise. Moreover, as I read the record, the trial court based its notion of "poor parenting skills" on the testimony of Hall and Clayton. But my analysis of their testimony calls their credibility into question. Additionally, if one believes Hall and Clayton's testimony then the trial court and the majority cannot properly support their ruling allowing Kali unsupervised visitation with her daughter and domiciliary custody when Richard is

8

unavailable. Hall and Clayton allege serious physical abuse of this child by Kali which, if taken as true, pretermits such findings.

But I do not believe the testimony of Hall and Clayton is worthy of belief. For example, I am troubled by the thought that if Kali acted as described by Hall why did Hall not report this to the authorities or at least to Cauble when he picked up Rowan on Sunday August 25, 2019? Hall testified she did not have any reason to believe Cauble mistreated Rowan, and, in her opinion, Rowan showed no fear of Cauble. She also testified when Cauble picked up Rowan on Sunday "she was laughing." "There is video footage from my security camera and she is laughing and happy." *This is inconsistent with her testimony about Rowan's severe condition the day before and with her description of Kali's alleged mistreatment of Rowan.* Second, it is hard to imagine that, if the scene was as Hall described, her infant son could have peacefully slept through it all or that Rowan slept undisturbed through the night. Third, and most troubling, is the expletive laden text Hall sent Kali which displays her intense anger toward Kali in this immediate time frame. By Hall's own admission this intense animosity toward Kali was the result of her being blocked on Kali's cell phone. And fourth, the medical evidence does not indicate any physical or emotional abuse of Rowan but instead indicates the opposite and lends no corroboration to Hall's account. Further, there is no medical evidence that Rowan was physically ill at this time or at any time near these dates.

Next, consider the testimony of Hall's friend, Clayton. Clayton says she has known Hall since she was fourteen years old, about six years earlier, and it is Hall who introduced her to Richard House. It was also Hall who invited Clayton to a cookout at Kali's home and introduced her to Kali. According to Clayton, while she was attending the cookout at Kali's home, she observed an encounter between Kali and Rowan.

A. She [Rowan] was just running around trying to be a kid playing.

Q. Okay, did anything occur between Mrs. House and Rowan, the baby?

9

. . . .

A. The kid, like I was saying, was running around playing like a normal kid does and Kali got upset and she's like, Rowan stop and she grabbed her by the arm and hit her; not like whipping.

Q. And how was—was she holding her, was the kid running from her, or just what was going on?

A. Rowan was trying to get away, yes sir.

Q. Was Mrs. House holding Rowan?

A. Yes, sir, by the arm.

. . . .

A. She was just running around on the couch trying to play and Kali got mad at her.

. . . .

Q. Okay, was Kali House—well, let me ask you this, how was the child reacting when she started to be hit?

A. She was starting to cry like she was upset, and she was trying to run, like get away.

Q. All right, and what was Mrs. House—was she saying anything to the child?

A. She was like, Rowan, stop you're annoying—like stop.

Q. Okay, and did she finally stop hitting the child?

A. Yes, sir, she did.

Q. Did you say anything to her?

A. I didn't want to say anything because I had just met her and I didn't want to tell her how to parent because it wasn't my place.
. . . .

Q. What happened after that incident? What—what did Mrs. House and Rowan do?

A. Everything went back to normal. Rowan like, went by herself and I went eat and that was it.

The trial court did not find this testimony demonstrates abusive behavior and neither do I. The trial court thought this behavior, at most, indicated bad parenting

10

skills. That, however, does not equate to abusive behavior of a substantial and continuing nature. Moreover, it does not appear from Clayton's actions at the time of the incident that she considered Kali's behavior cause for concern. She did not report the behavior to anyone at the party, much less to any authority after-the-fact, and she says everything just continued as normal after the interaction between Kali and Rowan.

If the testimony of Hall and Clayton is to be accepted as they intend, such testimony would contraindicate the trial court and the majority's ruling. I hasten to add that I find the testimony of Hall and Clayton unconvincing for the reasons I have stated and I repeat, the vitriolic text from Hall to Kali laced with expletive curse words aimed at Kali is especially telling. Additionally, Hall's testimony regarding her opinion of Kali's choice to celebrate her birthday out of town instead of taking care of her child does not constitute evidence of any abuse or neglect of Rowan by Kali. Indeed, the trial court, though professing some satisfaction with Hall's credibility, did not conclude her testimony proved any abuse or neglect by Kali. The majority recognizes this fact. Moreover, the trial court did not find Clayton provided any evidence of abuse or neglect either. I, too, agree that the testimony of Hall and Clayton does not establish any abuse or neglect of Rowan by Kali. The unbiased medical evidence presented showed there were no signs of any physical and/or emotional abuse of this child. The medical report describes the child as a happy, healthy, well-adjusted child who exhibited no signs of any form of abuse or neglect. Both Hall and Clayton, as well as Leggett, describe Rowan as a happy child just as stated in the medical evidence.

Based on my *de novo* review of the record I believe Richard failed to present evidence of any change in circumstances of a substantial and continuing nature that would warrant a change in the existing custody decree. I would reverse the trial court's judgment making the father domiciliary parent and order that the child be immediately returned to the physical custody and care of her mother. I would reinstate the provisions of the original Implementation Plan of Joint Custody. No evidence was

11

presented to support any change in that existing ruling except that physical custody can no longer be enjoyed with the same frequency as when the parties lived near each other. The parties have not raised any issue addressing the court's award of joint legal custody and its finding that neither parent was in contempt of the court's orders.

I am certainly mindful that the father's transfer to Hawaii by the military is beyond his control and it presents a practical problem concerning visitation. When these parents lived in proximity to one another they amicably enjoyed 50/50 visitation when Richard's military schedule permitted. With the mother now living in Dallas, Texas and the father stationed in Hawaii it is more challenging and costly to achieve parity between the parents. Further, voluntary accommodation between the parties to facilitate the 50/50 sharing of the child is no longer workable and the cost of forcing the parties to do so is prohibitive. Nevertheless, our law favors as close to equal time with both parents as can be reasonably achieved under each case's unique circumstances. Until this child reaches school age, or Richard is re-assigned closer to Dallas, Texas, the visitation schedule should have as its ultimate aim compliance with the statutory provisions [1] applicable hence. No basis has been established to remove Kali as domiciliary parent.

---

[1] Louisiana Revised Statutes 9:335(A)(2)(b) provides that, to the extent feasible and in the best interest of the child, physical custody should be shared equally. When the trial court is faced with a decree of joint custody, such as the one in the present case, the statute does not necessarily require an equal sharing of physical custody. *Yerger v. Yerger*, 49,790 (La.App. 2 Cir. 2/27/15), 162 So.3d 603; *Langford v. Langford*, 49,080 (La.App. 2 Cir. 4/9/14), 138 So.3d 101. Substantial time rather than strict equality of time is mandated by the legislative scheme. *Yerger,* 162 So.3d 603; *Semmes v. Semmes*, 45,006 (La.App. 2 Cir. 12/16/09), 27 So.3d 1024. The allocation of the time periods during which each parent shall have physical custody of the child is required to assure of frequent and continuing contact of the children with both parents. La.R.S. 9:335(A)(2)(a); *Yerger,* 162 So.3d 603. Notwithstanding, the jurisprudence has further recognized that the implication of La.R.S. 9:335 is that most joint custody decrees will invariably result in children primarily residing with one parent more than the other. *Langford*, 138 So.3d 101; *Stephenson v. Stephenson*, 37,323 (La.App. 2 Cir. 5/14/03), 847 So.2d 175.

*Joubert*, 285 So. 3d. at 7-8.