890 So.2d 796 (2004)
Fred D. KIDD, Sr. Plaintiff-Appellee,
v.
BROWN RADIATOR & FRAME Defendant-Appellant.
No. 38,729-WCA.
Court of Appeal of Louisiana, Second Circuit.
December 22, 2004.
*798 Eskridge E. Smith, Jr., Linda S. Blackman, Bossier City, Counsel for Appellant.
Fred D. Kidd, Sr., In Proper Person.
Before BROWN, STEWART and CARAWAY, JJ.
CARAWAY, J.
In this workers' compensation action, the defendant-employer appeals the judgment awarding its employee temporary total disability benefits for an eight month period and ordering an independent medical examination ("IME") of the employee by a court-selected physician after the benefits ceased. This court initially dismissed the defendant's appeal finding that the two rulings of the workers' compensation judge ("WCJ") were incongruent and interlocutory, and therefore not appealable. Kidd v. Brown Radiator & Frame, 38,279 (La.App.2d Cir.7/2/04), 877 So.2d 358, 2004 WL 1752600. Upon the defendant's application for writs to the Louisiana Supreme Court, the court reversed our conclusion of an interlocutory, non-appealable judgment and remanded for an opinion on the merits. Kidd v. Brown Radiator & Frame, 04-1961 (La.11/15/04), 887 So.2d 463. Finding sufficient evidence of a work-related accident and causation of the disability by that accident, we now affirm the WCJ's grant of benefits and the further order for an IME.

Facts
On September 9, 2002, Fred Kidd, Sr. was in his fifth year of employment with Brown Radiator and Frame, Inc. performing alignment work for the company. Kidd was paid a weekly draw of $300 which was deducted at the end of each month from his 50 percent commission salary. From his commissions, Kidd estimated he earned $40,000-45,000 annually and received five days of vacation.
During the afternoon hours of September 9, 2002, Kidd claimed he was attempting to obtain an air hose when he slipped and fell on an alignment rack injuring his right arm and shoulder. Chris Tramble, *799 another employee, acknowledged witnessing Kidd's fall and assisting him up afterwards, although he also made contradicting statements indicating that he did not see the mishap. Both Kidd and Chris Tramble recalled that Mike Tramble and Mitchell Jordan, the shop foreman, were nearby and that Jordan asked Kidd if he was okay. Mike Tramble denied witnessing the fall but admitted to observing Kidd get up from a lying down or seated position holding his shoulder on the day of the accident. Jordan denied knowing about or witnessing Kidd's accident until after receiving notice of the workers' compensation claim in November 2002. Jordan did recall, however, that Kidd complained of a "crick" in his neck during September or October, 2002.
The business records of Brown indicate Kidd continued to work until October 30, 2002, missing only two days for blood pressure problems. Kidd claimed he could no longer perform work by September 21, 2002, because of a "crick" in his neck that had moved into his shoulder. He stayed on the job only until September 22.
Randy Brown, the shop's owner, recalled that Kidd called the office on October 31 complaining that his shoulder was hurting and that he needed to go to the doctor. Kidd called Brown on November 1 to inform him that his doctor had told him not to go back to work until he met with an orthopedic doctor on November 6, 2002. On November 7, Kidd informed Brown he was scheduled for physical therapy the rest of the week and another doctor's appointment on November 11, 2002. When Brown did not hear from Kidd, he called him on November 13, 2002. Then, Kidd told Brown he had undergone an MRI and he would receive the results on November 21. Brown told Kidd to let him know if he would need surgery so that he could employ temporary help until Kidd's return. Brown never heard from Kidd after November 21, 2002, and was surprised to receive notice of the workers' compensation claim on November 30, 2002, because Kidd had never indicated that his shoulder problems were work related. Kidd and Chris Tramble claimed Brown told Kidd to report to the unemployment office. Kidd filed a claim for workers' compensation benefits on November 20, 2003, after he was turned away from the unemployment office.
The medical evidence presented at trial demonstrates that Kidd first visited E.A. Conway Medical Center in Monroe, LA, on September 22, 2002, with complaints of a sore throat, a stiff and painful neck on his right side and hypertension. Kidd next reported to Dr. Thomas St. Clair Williams on September 27, 2002, complaining of neck stiffness and hypertension. Dr. Williams noted neck tenderness in the right lower neck and trapezius muscle and questioned whether Kidd might have had a cervical strain with muscle spasm. Dr. Williams' notes do not reflect that a work-related event was the cause of Kidd's neck problems. At that time, Dr. Williams also diagnosed Kidd with probable diabetes.
Kidd saw Dr. Williams for follow-up visits on October 1 and 15, 2002, although only for diabetes and hypertension. On October 31, 2002, Kidd reported to Dr. Williams with complaints of worsening right shoulder and back pain. Dr. Williams diagnosed Kidd with bursitis of the right deltoid, arthralgia (pain) in the right shoulder and cervical strain. Kidd received an injection for the pain. Kidd had gone to the E.A. Conway emergency room the night before with neck stiffness radiating to the right arm which had worsened the day before.
Kidd next visited the E.A. Conway Orthopedic Clinic for an evaluation of his neck and right arm pain and stiffness on *800 November 6 and 7, 2002. The hospital notes from those visits show that despite Dr. Williams' diagnosis, Kidd desired to see an orthopedic specialist. Kidd reported having a "crick in his neck" since September 2002. X-rays of the area revealed mild multilevel degenerative change without evidence of fracture nor any evidence of soft tissue swelling or mass. Kidd was diagnosed with brachial plexitis, or a type of neurological pain in the shoulder of unknown origin. Further tests revealed no evidence of a Pancoast's tumor and revealed only mild thoracic spondylosis. Kidd returned for a follow-up visit on November 11, 2002. His physician could offer Kidd nothing further regarding his diagnosis.
Kidd's final documented visit with Dr. Williams occurred on December 17, 2002. Kidd claimed to have been diagnosed by E.A. Conway physicians with nerve damage to his right arm due to his cervical problems and that he had lost his job. Dr. Williams also noted that Kidd had been diagnosed with carpal tunnel syndrome.
A final letter written by Dr. Williams on February 18, 2003, set forth the doctor's treatment of Kidd since September 27, 2002, when Kidd "loosely mentioned" a work-related fall. Dr. Williams wrote of Kidd's progressive weakness, neck pain and discomfort during his visits with him and opined that Kidd's "significant fall" possibly caused a potential disruption of his right rotator cuff tendon. In the letter, the doctor concluded that Kidd was "relatively incapacitated" secondary to the injury and had been referred to LSU Shreveport Orthopedic Clinic for an evaluation of the problem. Dr. Williams envisioned possible surgical intervention and noted that Kidd was "truly incapacitated" and unable to perform his job duties. He also believed Kidd would not be able to return to gainful employment until a surgeon released him to do so after corrective surgery was done, if possible. Dr. Williams estimated a minimum six month recovery period for Kidd.
Kidd again visited E.A. Conway on February 19, 2003, and March 5, 2003, with continued complaints of shoulder pain. He also made visits to the Ambulatory Care Division of LSU Medical Center in Shreveport. On January 7, 2003, Kidd complained of right shoulder pain which began after a fall. At that time, the doctor ordered an MRI of the right shoulder and therapy for rotator cuff injuries. That MRI showed degenerative arthritis in the AC joint and high riding humeral head and interval increases in the distal spur on the acromium. A second MRI was ordered for Kidd on February 26, 2003. Kidd returned to LSU on March 11, 2003, explaining further that his injuries occurred when he fell on his shoulder two months earlier. On March 25, 2003, Kidd was informed that the MRI results showed a complete rupture of the rotator cuff and degenerative changes in the acromioclavicular joint with impingement over the supraspinatus muscle. Also noted were degenerative osteocartilaginous changes in the humeral disease. Kidd was scheduled for a right shoulder arthroscopy and open Mumford, subacromial decompression and rotator cuff repair. The surgery was scheduled for May 28, 2003. However, because the procedure was apparently delayed on the scheduled date, Kidd left the hospital before the operation could be performed. On August 25, 2003, Dr. Nawas diagnosed Kidd with severe neck pain and radiculopathy of the right arm as well as degenerative arthritis of the right shoulder with adhesive capsulitis.
The medical history of Kidd relating to his right shoulder is extensive. In October 1989, while working for Firestone as a certified alignment and brake specialist, *801 Kidd slipped on an oil spot, falling on and injuring his right shoulder. He was treated by Dr. Nawas for the shoulder injuries. Kidd underwent three shoulder surgeries from December 1989 through September 1990 which included repair of the shoulder and a torn rotator cuff. Before his final September 1990 surgery, Kidd began experiencing fear of anesthesia which delayed his surgery. After September of 1990, Kidd underwent unsuccessful physical therapy on the shoulder. On January 24, 1991, Dr. Nawas released Kidd to return to work as part of his physical therapy regimen. However, Kidd did not return to work due to fear of injury and had made no significant progress. Further attempts by Dr. Nawas to perform a manipulation procedure were frustrated due to Kidd's fear of anesthesia.
Dr. Nawas released Kidd from his care on January 9, 1992, noting that he had no more to offer the patient. During his treatment of Kidd, Dr. Nawas reported that it was his low pain tolerance which frustrated the required aggressive physical therapy needed for his optimal improvement. Dr. Nawas also opined that Kidd's reluctance about undergoing anesthesia for any necessary surgical or non-surgical procedure "compromised his treatment and outcome." Dr. Nawas assigned Kidd a functional impairment of 10-20 percent on the upper right arm.
Kidd began seeing Dr. Randolph Taylor in July 1992. Dr. Taylor referred Kidd to a physical therapist who indicated that while Kidd had very limited motion in his shoulder, he had "good potential." Nevertheless, Kidd made very little progress with the physical therapy and Dr. Taylor calculated Kidd's permanent partial impairment on his right upper extremity at 28 percent in November 1992.
In May 1993, Kidd saw Dr. James Potts for his shoulder. Dr. Potts could add nothing to Dr. Taylor's regimen but recommended vocational rehabilitation for Kidd. In March 1994, Kidd saw Dr. Myron Bailey who recommended a psychological evaluation for Kidd. On August 31, 1993, Kidd reported to the St. Francis Hospital emergency room complaining that he fell onto his right shoulder while mowing a lawn. In June 1994, Kidd reported to LSU Medical Center with shoulder pain. He underwent physical therapy which brought good results. As of November 1994, however, the physical therapy was doing no good. An MRI failed to reveal the source of the pain.
Kidd's medical history also includes gastro-intestinal problems during 1999, chest pains in 2000 and back problems in 2002.
For his 1989 fall at Firestone, Kidd obtained a judgment for workers' compensation on February 21, 1996. When Kidd disputed the judgment, the parties entered into a $36,136.45 compromise settlement agreement on April 9, 1996. Kidd chose not to return to work for Firestone.
Thereafter, Kidd went to work for Scott Cummins Salvage in February 1997 and worked there for a couple of years driving wreckers and trucks before going to work for Brown. At trial, Kidd admitted to lying about his physical limitations on his job application with Scott Cummins Salvage because he believed he would not get a job with the company if he told the truth. Kidd also admitted that he lied about his educational background on that application.
The present case proceeded to trial on September 30, 2003. After hearing the testimony of the witnesses, the Workers' Compensation Judge ("WCJ") ruled in favor of Kidd. Specifically regarding Kidd's proof that a work-related accident occurred, the WCJ noted as follows:

*802 When looking at that situation and other evidence that's been presented to me today, I don't find that the claimant is the most credible person that I've had come before me. Information indicates that he lied on applications with Scott Cummins, and he lied to the Social Security Administration. He had conflicts in his deposition testimony, and it may even be a situation that he lied to this Court about whether he was working for one, C & J Barbeque and Scott Cummins, at that same time that he was telling me that he was unable to work during that prior proceeding....
The only person that testified they actually witnessed the accident was one, Chris Tramble. I must say that I was impressed with the testimony of Mr. Tramble and felt that he actually corroborated the statements of the claimant....
The other person whose testimony I was impressed with was the testimony of Mitchell Jordan. Mr. Jordan said that he found the claimant to be a hard worker.... Now, Mr. Jordan said he didn't see a slip-and-fall, but one thing Mr. Jordan did notice there was something going on with Mr. Kidd's neck during the month of September and October. Something occurred....
Based upon this testimony and the medical evidence which indicated that Kidd complained of neck injuries from September 27, 2002, and thereafter, the WCJ determined that Kidd had established that a work-related accident had occurred.
The WCJ also awarded temporary total disability benefits to Kidd in the amount of $416.00 per week from January 7, 2003, until August 24, 2003. The January 7, 2003, date was based upon the LSU medical records and Dr. Williams' letter. The WCJ determined that those records first referenced Kidd's inability to work. The August 24, 2003, date related to the report of Dr. Nawas which characterized Kidd's shoulder difficulties as degenerative arthritis. Since degenerative arthritis is not compensable under the workers' compensation statute, the WCJ ended Kidd's benefits based on Dr. Nawas' conclusion. The court further ruled as follows:
I note that there is a conflict in the medical opinions of the orthopedic physicians. The physician at LSU Shreveport shows possible rotator cuff injury. Dr. Nawas shows a degenerative condition related to arthritis. Therefore, that's a conflict in the medical opinion. I'm ordering the claimant to be examined by an independent medical examiner. I'm appointing Dr. Zombrennin (sic) to do that independent medical examination to determine the nature of the disability. I want him to tell me whether it's a degenerative condition related to the prior injury and an arthritic condition, or if it is as a result of a trauma. Upon receipt of Dr. Zombrennin's (sic) report, I'll be able to determine whether the claimant is entitled to additional benefits after August 25, 2003, and if he's entitled to additional medical treatment.
Brown has appealed arguing that the WCJ erred after concluding that Kidd was not a credible witness but finding he had presented sufficient evidence to establish a work-related accident and his entitlement to temporary total disability benefits from January 7, 2003, through August 24, 2003. Finally, Brown contends that the WCJ erred in ordering Kidd to undergo an IME to determine his entitlement to future benefits.

Discussion
Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Murray v. Hollywood Casino, *803 38,539 (La.App.2d Cir.6/23/04), 877 So.2d 199. In applying the manifest error/clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Id. Whether the claimant has carried his burden of proof and whether testimony is credible are questions of facts to be determined by the hearing officer. Lewis v. Chateau D'Arbonne Nurse Care Center, 38,394 (La.App.2d Cir.4/7/04), 870 So.2d 515. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id.
In a worker's compensation action, the plaintiff must establish a work-related accident by a preponderance of the evidence. Millage v. Builder's Lumber & Supply Co., 38,635 (La.App.2d Cir.7/2/04), 877 So.2d 1171, writ denied, 04-1885 (La.10/29/04), 885 So.2d 594. Proof by a preponderance of the evidence exists when the evidence, taken as a whole, shows the facts sought to be proved are more probable than not. Lewis v. Chateau D'Arbonne Nurse Care Center, supra. The causal connection can be established when the employee proves that before the accident he was in good health, but commencing with the accident, symptoms of the disabling condition appeared, and there is sufficient medical evidence to show a reasonable possibility of a causal connection between the accident and the disabling condition. Id. An employee's pre-existing condition does not disqualify his claim if the work-related injury either aggravated or combined with the infirmity to produce disability for which compensation is claimed. Id. When a claimant proves that he had no disabling symptoms before the accident, but that commencing with the accident, the disabling symptoms appeared, and there is medical or circumstantial evidence indicating a possibility of a causal connection between the accident and the disabling condition, a claimant's work injury is presumed to have aggravated a pre-existing infirmity to produce his disability. Id. The worker's testimony alone may be sufficient to satisfy this burden, provided that two elements are satisfied: first, there must be no other evidence which discredits or casts serious doubt on the worker's version of the incident; and second, the worker's testimony must be corroborated by the testimony of fellow workers, spouses and other close family members, friends or the introduction of medical evidence. Bruno v. Harbert International, Inc., 593 So.2d 357 (La.1992).
The WCJ is afforded considerable discretion in evaluating expert testimony, and the decision to accept the testimony of one expert over the conflicting testimony of another can virtually never be manifestly erroneous. Anthony v. BE & K Construction, 32,729 (La.App.2d Cir.5/10/00), 760 So.2d 608, writ denied, 00-1673 (La.9/15/00), 768 So.2d 1280. The court may accept or reject the opinion of a medical expert depending upon what impressions the qualifications, credibility, and testimony of that expert make on the court. Spence v. Industrial N.D. T., 31,744 (La.App.2d Cir.3/31/99), 731 So.2d 473.

Work-Related Accident
First, Brown argues that the WCJ's determination that Kidd lacked credibility precluded the finding of a work-related accident. In finding that adequate proof existed to establish Kidd's work-related injury, the WCJ relied on the medical evidence and testimony of Kidd's fellow workers to verify the claim. Specifically, the WCJ accepted as corroborating evidence the testimony of Mike Tramble, who stated at trial that he had witnessed Kidd's *804 fall. Previously, Mike Tramble would only admit that he saw Kidd lying on the beam after the alleged incident. Nevertheless, the WCJ accepted Mike Tramble's explanation that fear for his job precipitated his previous inconsistent statements that he had not actually witnessed the accident. Additionally, the testimony of Mitchell Jordan and Randy Brown showed that Kidd complained of neck pain during September and October 2002. The medical reports after the time of the accident showed that Kidd consistently complained of neck and shoulder pain from as early as September 27, 2002, through the end of the year and the beginning of 2003 when he was ultimately diagnosed with a rotator cuff tear and scheduled for surgery.
The determination that Kidd proved a work-related event is a finding of fact based partly on credibility determinations which remain within the province of the hearing officer. We are called to decide whether these factual findings are reasonable, not right or wrong. Stobart v. State, through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Certainly, if believed, Mike Tramble's trial testimony is adequate to prove the work-related accident. Moreover, the WCJ remained in a superior position to evaluate the credibility of any inconsistencies in Mike Tramble's testimony and accepted his explanations for his actions. Likewise, while the WCJ recognized past credibility issues involving Kidd, the decision to credit his testimony regarding the present matters is a determination for the WCJ and will not be disturbed on appeal. On these grounds, we find the hearing officer's determination of a work-related accident reasonably supported by the record.

Causation of Disability
Next, Brown asserts that the conflicting medical testimony, Kidd's lack of credibility, and the WCJ's ruling for an IME demonstrate that the cause of Kidd's shoulder injury was never proven to be the work-related accident. Admittedly, as observed in our initial ruling in this case, there is an incongruence in the two rulings of the WCJ. On the one hand, the judgment grants benefits for a limited time period on the apparent finding that the causation was a recent injury to Kidd's rotator cuff. On the other, the judgment for benefits abruptly ends as of August 25, 2003, when Dr. Nawas diagnosed the cause as degenerative arthritis, which would not allow for workers' compensation benefits. The ruling grants no further benefits after August 25, 2003, and orders the IME as the WCJ's express effort to answer the causation question presented by the conflicting medical testimony.
Despite the ambivalence in the WCJ's oral reasons for decision, we are guided by the appellate rule requiring this court's review of the judgment and not the lower court's reasons for judgment. Rogers v. Stockmon, 34,327 (La.App.2d Cir.11/1/00), 780 So.2d 386. The judgment makes an award of benefits apparently related to the suggested rotator cuff injury and not the non-compensatory gradual process of arthritic degeneration.
The medical evidence reviewed above contains no deposition testimony of the doctors. The medical reports show that Kidd complained to his co-worker of neck and shoulder problems during September and October of 2002 and consistently complained of such shoulder and neck pain to his physicians through the end of the year. The LSU report on January 7, 2003, first related Kidd's right shoulder rotator cuff injury to a September 2002 fall. A detailed letter from Dr. Williams in February 2003 clearly linked Kidd's shoulder disability to the September 2002, "work-related fall" that occurred when Kidd slipped in *805 the shop area. The WCJ obviously accepted the opinion of Dr. Williams and the LSU diagnosis that Kidd's disabling shoulder complaints were caused by the September 2002 work-related event. Those opinions indicate that a recent trauma caused an injury to the rotator cuff. The later report of Dr. Nawas which emphasized Kidd's degenerative arthritis does not exclude the conclusion that the work-related accident aggravated that pre-existing condition. Accordingly, on the record before us, we cannot conclude that the WCJ ruling was manifestly erroneous.

IME
Finally, we do not find error in the WCJ's additional ruling for an IME. As we noted in our earlier opinion, the order of an IME by the WCJ on its own motion is sanctioned by La. R.S. 23:1124.1. This statute gives the WCJ discretion to hold open a case for the production of additional evidence or the ordering of additional medical examination if the court is of the opinion that further medical evidence is necessary. Watkins v. Asphalt Associates, Inc., 96-249 (La.App. 3d Cir.12/4/96), 685 So.2d 393; Gary v. Dimmick Supply Co., 427 So.2d 33 (La.App. 3d Cir.1983). Such a procedure is utilized when the WCJ is unable to make a full assessment regarding the nature and extent of a claimant's disability. Additionally, the power and jurisdiction of the WCJ over each case shall be continuing and the WCJ may, upon application by a party and after a contradictory hearing, make such modifications or changes with respect to former findings or orders relating thereto if, in his opinion, it may be justified, including the right to require physical examinations. La. R.S. 23:1310.8(A). Upon the application of any party in interest, on the ground of a change in conditions, the WCJ may, after a contradictory hearing, review any award, and on such review, may make an award ending, diminishing, or increasing the compensation previously awarded. La. R.S. 23:1310.8(B).
Because we have herein affirmed the benefit award for Kidd's work-related injury, the additional ruling for the IME is appropriate. The WCJ may utilize the results of the IME in the continuing review of the case.
For the foregoing reasons, we affirm the judgment of the WCJ at Brown's costs.
AFFIRMED.