JjDREW, J.
Western Refractory Construction, Inc. (“Western”) appeals a judgment awarding workers’ compensation benefits, attorney fees, and penalties to Pat Hays. We affirm the judgment, but remand for a determination of the number of weeks of workers’ compensation benefits that are subject to the La. R.S. 23:1225 offset for the receipt of unemployment benefits.
FACTS
Thomas Hays was hired by Western in April of 2003 to work as an industrial brick mason on a refractory maintenance project at a cement plant in Utah. Hays, who began working on April 2, 2003, was assigned to work the evening shift constructing a kiln at the plant. He was paid $23 an hour and worked 12 hours a day, seven days a week.
Hays’ job was to place bricks in an ascending circle that was approximately 16 to 18 feet in diameter. His position was known as the key man. Hays alleged that he was injured on April 12, 2003, while he was using a shim driver to drive a flat metal shim next to a key brick.[1] The shim *668 driver is an air-driven hammer that by Hays’ estimate weighed between 40 and 50 pounds. Hays alleged that he was using the shim driver to drive a metal shim overhead when he felt a shock or pinch in his neck and a pain between his shoulder blades.
After suffering this injury, Hays spent the remainder of his shift operating a forklift. He returned to work the next night, Sunday, but left | ¡¡after working only a few hours because he was not feeling well and his shoulder was bothering him. He did not go to work on Monday night, and later that evening was informed that he was to return to Louisiana the next morning. Upon returning to Louisiana, Hays rested and tried to recuperate because he thought he could continue working as a brick mason. He obtained employment with an Arkansas company, but he was terminated on his first day when the company learned of his injury after his.boss questioned him about the manner in which he was using his right arm. Hays has not worked since.
Hays was treated by his primary-care physician, Dr. Doyle Hamilton, on May 6, 2003. The notes from that visit reflect that Hays complained of a stiff neck and pinched nerve. Dr. Hamilton wrote down “Utah” on the record for that visit, but otherwise Dr. Hamilton did not record anything else about how Hays incurred his injury. Hays continued to complain of a pinched nerve in his back, with the pain getting worse, when he was treated by Dr. Hamilton the next month.
Dr. Hamilton subsequently referred Hays to Dr. David Trettin at The Ortho-paedic Clinic of North Louisiana, where Hays was examined on June 27, 2003. Hays complained of trapezius pain and numbness down his right arm. Hays reported that he had suffered these ailments for the prior four months, with the numbness in the right arm becoming progressively more severe over the past six weeks. An MRI performed on August 7, 2003, revealed a C6-7 disc herniation on the right which was causing his right arm pain and numbness.
| oDr. Trettin referred Hays to Dr. Ronald Ellis for cervical epidural steroid injections. When Hays met with Dr. Ellis on August 26, 2003, Hays provided Dr. Ellis with a detailed history of how his injury occurred while he was working in Utah. Hays described his pain as starting in the posterior neck and upper back and radiating across the posterior shoulder and down the posterior aspect of the arm onto the lateral forearm to the middle three fingers. Hays also complained of numbness down the arm into those three fingers. Dr. Ellis’s impression was “chronic neck and right upper extremity pain secondary to right posterolateral C6-7 disc herniation with C7 nerve root impingement and secondary right upper back myofascial pain.”
On August 28, 2003, Hays filed a 1008 Disputed Claim for Compensation form seeking workers’ compensation benefits, medical treatment, attorney fees, and penalties. He asserted that he was running a jack hammer overhead and felt something pop in the middle of his back between his shoulder blades. In its answer, Western’s insurer, Zurich American Insurance Company, pled the La. R.S. 23:1225 offset.
Hays received cervical epidural steroid injections on three occasions in September of 2003, but they offered only limited relief for a short time. After Hays requested a referral for an evaluation for possible cervical surgery, he met with Dr. Bernie McHugh on January 13, 2004. Dr. McHugh ordered an MRI, which revealed mild spondylosis to the C5-7 levels and moderate superimposed right posterolateral disc herniation at C6-7 with compromise of the right neural foramen and C7 nerve root.
*669 |4Following the March 2004 trial, the WCJ found that Hays was temporarily totally disabled and ordered payment of weekly benefits of $416 due from April 13, 2003. Western was ordered to pay for medical treatment for Hays’ work injury. Western was also assessed penalties of $2,000, and was ordered to pay attorney fees of $6,000 and costs of the proceedings. The judgment did not address the La. R.S. 23:1225 offset.
DISCUSSION

Compensable Accident

Western’s first argument on appeal is that the WCJ erred in finding that Hays established the occurrence of a com-pensable accident. Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551.
In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Id. When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even though the appellate court may feel its own inferences and evaluations are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993).
| sWhen factual findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard of review demands great deference to the trier of fact’s findings, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Rosell v. ESCO, supra.
A workers’ compensation claimant bears the burden of establishing by a preponderance of the evidence that he has received “personal injury by accident arising out of and in the course of his employment.” La. R.S. 23:1031(A); Hoy v. Gilbert, 98-1565 (La.3/2/99), 754 So.2d 207.
The worker’s testimony alone may be sufficient to satisfy this burden, provided that two elements are satisfied: first, there must be no other evidence which discredits or casts serious doubt on the worker’s version of the incident; and second, the worker’s testimony must be corroborated by the testimony of fellow workers, spouses and other close family members, friends or the introduction of medical evidence. Bruno v. Harbert International, Inc., 593 So.2d 357 (La.1992); Kidd v. Brown Radiator & Frame, 38,729 (La.App. 2d Cir.12/22/04), 890 So.2d 796, unit denied, 2005-0172 (La.3/24/05), 896 So.2d 1042.
Western complains that the history provided by Hays to his physicians evolved after Hays obtained legal representation. Hays was unsure if he told Dr. Hamilton about his job in Utah, although he thought he did. “Utah” is noted on the chart for his first visit, and Hays was “sure [he] told him [he] hurt it at work or something.” Dr. Hamilton continued to treat 1 fiHays in June, when Hays reported a pinched nerve in the back and worsening pain. Hays admitted that nowhere in Dr. Hamilton’s records is it specifically recorded that Hays had been involved in a work accident or had sustained a work injury.
*670 On referral from Dr. Hamilton, Hays saw Dr. Trettin on June 27, 2003. When Hays filled out Dr. Trettin’s patient questionnaire, he wrote that his discomfort was back pain that began four months earlier. Dr. Trettin noted in his records from the examination that Hays complained of pain and numbness down his right arm that had been occurring for four months, with the numbness growing more severe over the prior six weeks. Hays explained at trial that he was referring to stiffness that he had suffered prior to the injury. Hays also explained that the numbness was in reference to carpal tunnel syndrome in his wrist, which was different from the numbness in his shoulder.[2] Hays denied having numbness in his arm before the injury. In Dr. Trettin’s questionnaire, Hays also wrote that his problems were back pain and a nerve going down his arm that hurt, and that he had experienced similar problems five years earlier.
Hays stated that although he did not tell Dr. Trettin about the particular incident, he may have told Dr. Trettin that his injury had to be job related. The accident is not mentioned in the history provided to Dr. Trettin. Hays testified that when Dr. Trettin asked him if it was a workers’ comp claim, he answered “no” because “it wasn’t at the time.”
|7Two days before he filed his workers’ comp claim, Hays was treated by Dr. Ellis. Hays told Dr. Ellis that he had symptoms that began on April 12, 2003, and he described how, while holding up a 60-pound jackhammer driving shims into an overhead brick archway, he felt a crick in his neck with shocking sensations radiating down his right arm. The records from Dr. McHugh, who examined Hays on January 13, 2004, also show that Hays provided a detailed description of how he was injured.
When Hays was asked at trial why he said one thing to physicians before retaining counsel, and then said something else after hiring an attorney, Hays responded, “Before I got an attorney I didn’t realize how bad I was hurting.” Hays explained:
Okay. Well, what I told the doctors first, I didn’t know how bad I was injured. And before I hired Mr. Street I was trying to take care of myself. I was trying to fix my shoulder. I didn’t go into depth to what happened with these people I talked with. I told them I had hurt it on the job or something like that. But as we got down the line things started getting more in depth. They started asking me more questions, specific questions and things like that. That’s why I think it would change. I mean, I went down into depth to what had happened, actually happened. I remember exactly when it happened, when the pinch in my neck come. I exactly remember that. And to me, that’s considered getting hurt on the job, and I think that’s — -when I realized I couldn’t work no more and couldn’t use my arm, you know, I told Dr. Hamilton that I had hurt it working. But I don’t know if I got the specific details, you know, when they asked me about that. As I went on, they asked me questions and I told them, “I hurt it with a jack hammer on the job.”
Hays denied that he had any problems with his right arm prior to the injury that were similar to what he was suffering as a result of the April 12 accident in Utah.
| «Western asserts Hays’ credibility should have been questioned because of the misrepresentations made by him in his application for unemployment benefits, *671 pre-employment questionnaire, and his interrogatory responses.
Hays was examined by Dr. Hamilton on October 5, 1993, after he fell on his left shoulder while playing football. Hays complained of back pain when he was treated by Dr. Hamilton on March 23, 1994. Dr. Hamilton’s impression was a pinched nerve. There were complaints of upper back and right shoulder pain when Hays visited Dr. Hamilton on June 28, 1994. On March 21, 1995, Hays sought treatment from Dr. Hamilton for a backache. Hays complained of back pain and stiff muscles to Dr. Hamilton as recently as February 11, 2003. He received a Soma prescription from Dr. Hamilton on March 17 and 24, 2003. As noted earlier in this opinion, Hays wrote on Dr. Tret-tin’s patient questionnaire that he had experienced similar back pain five years earlier.
Western contends that despite these medical conditions, on Hays’ employment application, he checked the “No” boxes to the questions of whether he had ever had a loss or disability of his hand or arm, a back injury, or a head injury.
Western also notes that in the discovery interrogatories propounded to Hays, he responded “No” to questions about whether:
• He had ever injured any part of his body.
• Prior to April 12, 2003, he had ever had problems (defined as pain, restricted range of motion, muscle spasms, numbness, or tingling) in his neck, right shoulder, right arm, right elbow, right wrist, or right hand.
1 flHays stated that although he complained about back pains and stiffness during the earlier visits with Dr. Hamilton, it is common for brick masons to be stiff and sore, as well as for them to have strained and pulled muscles. Hays did not consider the various pulled, sore, stiff, and strained muscles he sustained over his career as a brick mason to be injuries because none of these ailments prevented him from working. Hays defined an injury as something that stopped him, and he believes that he sustained an injury on April 12. His coworker, Louis “Tony” Gandy, recalled that while driving from the plant to the motel, Hays would sometimes complain that his back was sore. However, Gandy added that he and other workers would also have similar complaints.
Hays began receiving unemployment benefits a few weeks after he was injured. He was unsure if, when he applied for unemployment benefits, he certified that he was not disabled and was capable of working. When asked at trial if he was doing what he had to do to get money, Hays replied that “to a certain extent” he was.
In additional support of its argument that Hays failed to prove a work accident, Western points to the lack of written documentation recording the accident. Western asserts that it is significant that Hays first reported a work-related injury in August, nearly four months after he allegedly injured himself inside the kiln.
David Cannon is the corporate safety director for Western. For every project in which Western is hired, he prepares a Safety, Health and Environmental Action Plan (“SHEAP”). The SHEAP for the Utah project Instated that all accidents and injuries, however minor, were to be reported to the safety representative immediately. The SHEAP further stated that in the event of an accident or injury, the supervisor of the employee shall conduct an investigation and report to the safety representative within one hour, and a written report was to be given to the safety representative within 12 hours. Cannon, who is a registered nurse, testi *672 fied that if he can treat an injury in the first aid trailer, then an accident report was not required. However, the incident would still be recorded on the first aid log.
At the beginning of the Utah project, Cannon conducted an orientation meeting in which he covered the SHEAP, including reading and explaining the information about reporting accidents and injuries. Hays was present for this orientation. In addition, a safety meeting was held before each shift, and employees were reminded during these meetings to report accidents and injuries. Cannon conducted the majority of these meetings.
Hays testified that when he felt the injury, he put the air hammer down, finished what he was doing, and told Barry Buria, a brick mason working alongside him and who was the foreman in the kiln, that he had hurt something in his back. Buria denied that Hays ever mentioned that he sustained an injury.
Hays declared that he then reported his injury to Jerry Sedillo, the night supervisor. Hays recalled that Sedillo laughed, said Hays needed to gain weight, and told him to take it easy for the remainder of his shift. Hays operated a forklift until his shift ended. Sedillo denied that Hays ever reported any injury or accident, and he could not remember Hays ever Intelling him anything that would make him believe that Hays sustained any sort of injury or had any sort of accident. However, after Sedillo stated he was working the night of April 12, Sedillo was then asked if Hays “did not tell [him] that he hurt his shoulder or had a problem working that air hammer.” Sedillo replied, “Yes, sir, I believe he did tell me that.” Confusingly, Sedillo later testified that he missed work on Saturday, April 12.
Hays asserted that his assignment the next day was to assist a Gunite gunner, which he was unable to do because the required pulling of a heavy hose hurt his shoulders. After working four to five hours, Hays reported to a supervisor, whose name he could not recall, that he was feeling sick and his shoulder was bothering him. In spite of being paid double-time for working on a Sunday, Hays asked for someone to drive him to his motel room. Sedillo testified that Hays appeared sick and told him that he was returning to the motel because he was not feeling well and was sick. Sedillo added that Hays never said anything about his neck or shoulder hurting him before he left. Sedillo, who thought it was unusual for an employee to leave work on a day in which he would receive double-time pay, did not record the sickness on the first aid log because he did not consider it a work injury.
Hays did not return to work on Monday night because he was stiff and sore, and his shoulder continued to bother him. He instructed Gandy to inform the supervisor of this. Gandy recalled telling Sedillo that Hays would not be at work that night because his back was still bothering him. Gandy also recalled that Sedillo asked if Hays had “shut-down fever,” |,¿which apparently meant he was using drugs. Sed-illo denied that Gandy told him that Hays would not be at work that evening because Hays’ back was hurting.
Later that Monday evening, a Western representative went to Hays’ motel room and told him that he would be returning to Monroe the next morning. Hays was given a plane ticket and any money owed to him by Western. Hays knew he was being laid off, but he thought the reason might be because Western was approaching the end of its project. Sedillo stated that Hays was laid off because of a reduction in force. Two other employees were laid off at the same time. The decision to termi *673 nate Hays was made by Sedillo on Sunday night after Hays left work.
Frank Kirby, a labor foreman for Western, drove Hays to the airport. Kirby could not recall Hays saying anything during the drive about being injured or having an accident. Kirby testified that Hays never asked for help with his luggage or toolbox at the airport.
There is no written record of an injury-reported to Western by Hays. Cannon stated that if Hays had reported the injury he is alleging, an accident report would have been filed and Hays would have been taken to a doctor. However, despite what was written in the SHEAP about the reporting procedure, Cannon also stated that it would have been proper for Hays to report an injury to his immediate supervisor, Sedillo, who was familiar with the procedure for reporting injuries.
Hays testified that he called Kent Baumgardner, Western’s project manager, a few weeks after the accident. The parties offer different Inversions of the call. Hays stated that he was only able to tell Baumgardner his name and where he was from before Baumgardner began cursing him and said he would never work for Western again. Hays testified that he did not get the chance to tell Baumgardner about his injury. Baumgardner testified that Hays called him in late May or early June of 2003 and inquired about working for Western again. Baumgardner told Hays he would not be rehired by Western. Baumgardner testified that during then-conversation Hays never mentioned being injured. Hays denied asking Baumgard-ner if he could return to Western, and he had no idea why Baumgardner said he could not work for Western again.
Hays called Cannon in August and said he had been injured on the job and was going to file a workers’ compensation claim. According to Cannon, this was the first time he had heard that Hays was alleging a work-related injury. Cannon asked Hays to forward his medical records. Hays told Cannon that he had called Baumgardner and had been cursed. Cannon then telephoned Baumgardner, who told Cannon that Hays had called inquiring about a job.
Hays asserts that he was injured while operating a heavy piece of power equipment overhead and working with heavy bricks.[3] Hays, who was 36 years old on the date of the accident, was 5' 11" and weighed approximately 135 pounds. He had worked as an industrial brick mason for about 15 years. According to Hays, he was injured at a point in the process 114when essentially all of his work was being done overhead. Not only was Hays operating the shim hammer overhead, but he was picking up bricks at his feet and placing them in the wall at the top of the circle.
Gandy, who is a friend of Hays and was his roommate at the motel, testified that Hays talked about his injury at the motel. Gandy, who has worked as a key man, stated that usually the larger men in a crew work as key men because it is heavy work. He recalled it was a joking matter that Hays was not large enough to do the job. Gandy also recalled Buria joking that Hays needed to be bigger.
Hays described the pain he felt as like “a crick in my neck, just a shock or a pinch, something to that effect, something different than any other thing I’ve ever *674 experienced.” The pain was felt between his shoulder blades. He described his condition at the time of trial as having pain and stiffness centered between his shoulder blades, as well as experiencing numbness in his right shoulder and arm when he stopped using his arm. He asserted that he is unable to work because he is right-handed and he cannot use his right arm as needed.
Based upon our review of the record, we cannot conclude that the trial court was clearly wrong in finding that Hays is entitled to workers’ compensation benefits.

Unemployment Benefits Offset

Western contends that the trial court erred in not applying the La. R.S. 23:1225(B) offset because Hays received unemployment benefits for Impart of the period that he has been awarded benefits. La. R.S. 23:1225(B) provides:
No compensation benefits shall be payable for temporary or permanent total disability or supplemental earnings benefits under this Chapter for any week in which the employee has received or is receiving unemployment compensation benefits.
Despite Western pleading the offset in its answer, the judgment does not address the offset.
Hays testified at trial that he received unemployment compensation benefits early in the summer of 2003, and he thought he received them for only a couple of months. The WCJ awarded workers’ compensation benefits due from April 13, 2003. Thus the evidence is clear that Hays was awarded workers’ compensation benefits for some of the same weeks in which he is to receive unemployment benefits, thereby making him ineligible to receive workers’ compensation benefits for those weeks.
Hays argues that it was Western’s burden to establish the amount received in unemployment compensation benefits. This is incorrect, as La. R.S. 23:1225(B) does not require a mere reduction in workers’ compensation benefits, but essentially an elimination of workers’ compensation benefits for any week in which the claimant received unemployment compensation benefits. Accordingly, Hays’ workers’ compensation benefits are subject to this offset, and this matter is remanded for a determination of the precise number of weeks in which Hays received unemployment compensation.
| T tJPenulties/Attorney Fees
Finally, Western contends that the WCJ erred in awarding penalties and attorney fees. Penalties are stricti juris and should be imposed only when the facts clearly negate good faith and just cause in connection with the refusal to pay. Lee v. Schumpert, 36,733 (La.App. 2d Cir.1/29/03), 836 So.2d 1214. Nevertheless, a WCJ has great discretion in awarding or denying penalties and attorney fees. Nowlin v. Breck Const. Co., 30,622 (La.App. 2d Cir.6/24/98), 715 So.2d 112.
We find no abuse of the WCJ’s discretion in making the award of penalties and attorney fees.
DECREE
At appellant’s costs, the judgment is AFFIRMED. The matter is REMANDED to the WCJ for a determination of the number of weeks of workers’ compensation benefits subject to the La. R.S. 23:1225(B) offset.

. A key brick is placed last in a ring of bricks and is used to tighten up the bricks. Metal shims help with the tightening process.

. One of Dr. McHugh’s impressions on January 13, 2004, was “physical examination with clinical findings of right carpal tunnel syndrome.”

. Hays estimated that the air hammer weighed 40-50 pounds and the bricks used in the kiln weighed 25-30 pounds each. Gandy guessed that the air hammer weighed more than 20 pounds, not counting the hose attached to it, and the bricks weighed between 10 to 35 pounds. Sedillo thought the air hammer weighed between 20 to 30 pounds.